## ALLEN v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 788. Submitted March 4, 1895. — Decided April 8, 1895.

In a trial for murder by shooting with a pistol it appeared that the accused and the deceased had had difficulties; that the accused, knowing that he was to meet the deceased, had armed himself with a pistol; that when they met the deceased and his companions were armed with sticks; that an altercation ensued which resulted in the shooting; and the evidence was conflicting as to who had made the first attack. The court, under exception, instructed the jury as follows: " Now, gentlemen, these are the three conditions which I give you in the case. I have told you that if it is true that this defendant went up on one side of the fence and when there struck Philip Henson in the mouth and then shot him, that is murder. On the other hand, if it is true that Henson and the other boys attacked him with sticks, and while that attack was going on and in the heat of that affray, and the sticks were not of a dangerous or deadly character, and under such circumstances he shot and killed Philip Henson, that would be manslaughter; but if there was an absence of that condition, then there is no manslaughter in it, nor could there be any self-defence in it. There could be nothing else but this distinct grade of crime known as murder; because self-defence, as I have before defined

to you, contemplates the doing of something upon the part of the one slain, or the ones acting with him, that was either actually and really so apparently of a deadly character, or which threatened great violence to the person, or that which seemed to do so. If they assaulted him with these sticks, and they were not deadly weapons, and they were engaged in a conflict, and in that conflict the defendant shot Philip Henson, without previous preparation, without previous deliberation, without previous selection of a deadly weapon, without a contemplated purpose to use that deadly weapon in a dangerous way, then that would be manslaughter, and it could not be self-defence, because the injury received would not be of that deadly character or that dangerous nature that could give a man the right to slay another because of threatened deadly injury or actual great bodily injury received." *Held*, that this instruction was erroneous in withdrawing from the jury the question of self-defence, and likewise in telling them that the intentional arming himself with a pistol by the defendant, even if with a view to self-defence, would make a case of murder unless the actual affray developed a case of necessary self-defence.

In the Circuit Court of the United States for the Western District of Arkansas, at the May term, 1894, Alexander Allen was tried, and found guilty of the murder of one Philip Henson.

The evidence certified by the bill of exceptions shows that Philip Henson, a white boy, about seventeen years old, was shot and killed by the defendant, a colored boy, about fifteen years old, on May 15, 1892. It appears that two or three days before these boys, with several companions, had met and had a difficulty. James Marks testified that, on that occasion, Henson and his party followed them and threw sticks at them, and said : " We will be over Saturday to settle with you." Allen, testifying in his own behalf, said that the first time he ever saw deceased, Philip Henson, was two days before the killing ; that James Marks, on whose farm defendant was working, and defendant were out hunting horses when he saw Henson and other boys ; that he made inquiry of them about the horses, and that he and Jim Marks started to go across a creek, and Henson and his companions followed them and threw sticks at them, and said they would kill that nigger the first chance they got, and said they would settle it on Saturday.

The scene of the shooting was at or near a hog pen on

Marks' farm. There was a wire fence separating the Marks place from an adjacent field. The testimony is contradictory as to whether Henson and his companions crossed the fence into the Marks farm. The Henson party had freshly cut sticks in their hands. An altercation took place. Young Marks testified that Henson said, when the defendant asked them what they came after, they came to kill a nigger. The story told by Willie Erne, one of the Henson party, a boy of thirteen years of age, was the clearest statement on behalf of the prosecution of what took place. It was as follows:

" On Saturday, Philip, George, and I started to go fishing ; we had some willow sticks to kill frogs with for bait. We went a little over half way and saw some one behind Marks' hog pen, and when we got up about the length of the courtroom [about seventy feet] from the fence, and defendant got up and walked along the fence, and we kept walking the same way we had been walking, that is, we were walking not towards the Marks house, but northeast the yard fence, behind which was the defendant, walked north. We were not intending to go into the yard ; we intended to cross north of the yard, because that was nearest to the lake and defendant said, ' Hello, George, where are you going ? ' and George said, ' Going fishing,' and defendant said, ' Well, hold on ; I heard you said I told a lie on you ; ' defendant pulled his pistol out at that time, and George said, ' Maybe I did.' Defendant pulled scabbard off pistol and handed it to the Marks boy, and got through the fence and walked up to Philip Henson and hit him in the mouth with his left hand and pulled down the pistol with his right hand, and Philip grabbed it, and it shot into the ground ; then Philip dropped the pistol, and he shot Philip under the arm, and when he turned around he shot him in the back, and then he shot at George twice, and hit George in the back ; he then snapped the pistol at me. I was running when he snapped at me. . . . When defendant shot Philip once Philip raised his stick, and I think he hit defendant with it. Defendant put the pistol on top wire of the fence and pointed it at us while we were about thirty yards away. He told us to stop, and we stood there till he got through the fence, and

he then pulled pistol out of the scabbard and gave it to the Marks boy, and came on up to us. We did not move; none of us said a word to him. The Marks boy was standing at the fence, looking through the wire, during the shooting. We did not go over on the side next to Marks — none of us. At the time defendant came out towards us Philip Henson was nearer to the defendant than George and I, and he bet Philip was larger than George."

The testimony of young Marks and of the defendant was to the effect that the Erne boy and Philip Henson crossed over the fence into the Marks yard and made the first assault, and that defendant did not draw his pistol or shoot until he had been knocked down and when three of the assailants were on him.

No appearance for plaintiff in error.

*Mr. Solicitor General* for defendants in error submitted on his brief.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

The facts, as made to appear by the testimony on both sides, were substantially these :

The difficulty was between boys; the oldest, Philip Henson, was about seventeen; Alexander Allen, the defendant, about fifteen, and the other participants were about twelve and thirteen years of age. The first encounter was on Thursday, when a quarrel took place, sticks were thrown, and threats made. On Saturday there was another meeting, when hostilities were renewed. The evidence is conflicting as to whether Henson and his party crossed the fence into the Marks yard, and as to which party made the first assault. An undeniable incident was that Philip Henson was fatally shot by a pistol in the hands of Allen.

In this condition of the evidence the court gave under exception the following instruction :

" Now, gentlemen, these are the three conditions which I give

you in the case. I have told you that if it is true that this:
defendant went up on one side of the fence and when there
struck Philip Henson in the mouth and then shot him, that is.
murder. On the other hand, if it is true that Henson and the
other boys attacked him with sticks, and while that attack
was going on and in the heat of that affray, and the sticks
were not of a dangerous or deadly character, and under such
circumstances he shot and killed Philip Henson, that would
be manslaughter; but if there was an absence of that con-
dition, then there is no manslaughter in it, nor could there be
any self-defence in it. There could be nothing else but this
distinct grade of crime known as murder; because self-defence,
as I have before defined to you, contemplates the doing of
something upon the part of the one slain, or the ones acting
with him, that was either actually and really so apparently of
a deadly character, or which threatened great violence to the
person, or that which seemed to do so. If they assaulted him
with these sticks, and they were not deadly weapons, and
they were engaged in a conflict, and in that conflict the de-
fendant shot Philip Henson, without previous preparation,
without previous deliberation, without previous selection of a
deadly weapon, without a contemplated purpose to use that
deadly weapon in a dangerous way, then that would be man-
slaughter, and it could not be self-defence, because the injury
received would not be of that deadly character or that danger-
ous nature that could give a man the right to slay another
because of threatened deadly injury or actual great bodily
injury received."

By this instruction the jury were shut up, in effect, to find
either manslaughter or murder — the claim of self-defence was
excluded. Or, rather, self-defence was eliminated if the sticks
were not " deadly weapons." In this we think there was error.
In one sense it may be true that sticks or clubs are not deadly
weapons. Carrying them does not import any hostile intent,
nor, even in view of an expected affray, a design to take life.
But when a fight is actually going on sticks and clubs may
become weapons of a very deadly character. Life may be
endangered or taken by blows from them as readily as by

balls from a pistol.   Hence we think that the jury ought not
to have been told that there " could not be any self-defence in
it;" and that "it could not be self-defence because the injury
received would not be of that deadly character or that danger-
ous nature that would give a man the right to slay another
because of threatened deadly injury or great bodily injury
received."   Such a question as that was one peculiarly for the
jury, and we think that they should have been left free to say
whether the accused had not a right, when defending himself
from an attack made by several persons using sticks, to con-
sider himself in danger of life or limb.   The verdict found,
that of murder, is, we think, convincing that the jury were
misled by this instruction.

But we think there was another substantial error in the
instruction complained of.   The jury were told that if " in
that conflict the defendant shot Philip Henson, without
previous preparation, without previous deliberation, without
previous selection of a deadly weapon, without a contemplated
purpose to use that deadly weapon in a dangerous way, then
that would be manslaughter and could not be self-defence."

This was objectionable, not only on the ground already
considered, that it shut out from the consideration of the jury
the claim of self-defence, but because of the assumption that
if the defendant, in view of the previous threats that he was
to be killed, and that Saturday had been fixed for the purpose,
had armed him with a pistol and subsequently used it when
attacked, it would have been not only not a case of self-
defence, but not even of manslaughter, but of murder.   The
instruction was that using a deadly weapon, not previously
selected with a purpose to use it, was, when used in circum-
stances of the kind shown, a case of manslaughter.  Thus
there was a necessary implication that, if the pistol had been
previously procured, with a view to using it in self-defence,
the defendant would be guilty of murder, if he discharged the
pistol with fatal effect, even while defending himself from an
attack threatening his life.

In this respect the instruction involved the same error
which we considered in the case of *Gourko* v. *United States,*

153 U. S. 183, and where it was held that a person who has an angry altercation with another person, such as to lead him to believe that he may require the means of self-defence in case of another encounter, may be justified, in the eye of the law, in arming himself for self-defence; and if, on meeting his adversary, on a subsequent occasion, he kills him, but not in necessary self-defence, his crime may be that of manslaughter or murder, as the circumstances, on the occasion of the killing, make it the one or the other; and that if, looking alone at those circumstances, his crime be that of manslaughter, it is not converted into murder by reason of his having previously armed himself. In the case of *Thompson* v. *United States*, 155 U. S. 271, the same view was taken by this court, and the judgment of the court below was reversed because, at the trial, the jury was instructed that " the previous selection, preparation, and subsequent use of a deadly weapon shows that there was a purpose to kill contemplated before that affray existed, and whenever that exists, when it is done improperly and unlawfully so that there is no law of self-defence in it, the fact that they may have been in an actual affray with hands or fists would not reduce the grade of the crime to manslaughter." This language was regarded by this court as erroneous because it involved the assumption that the act of the defendant in arming himself showed a purpose to kill, formed before the actual affray.

Being, then, of opinion that the instruction was erroneous in withdrawing from the jury the question of self-defence, and likewise in telling them that the intentional arming himself with a pistol by the defendant, even if. with a view to self-defence, would make a case of murder unless the actual affray developed a case of necessary self-defence, we reverse the judgment of the court below, and remand the case, with directions to set aside the verdict and award a new trial.

*Reversed.*

Mr. Justice Brewer dissented.